**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**CENTRAL DIVISION**
**FRANKFORT**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )   **NO. 3:24-CR-00004-GFVT-MAS-1** |
| | ) |
| **NATIVIDAD AGUILERA GARCIA,** | ) |
| | ) |
| **Defendant.** | ) |
| | ) |
| | ) |

**<u>MEMORANDUM OPINION & ORDER</u>**

The Indictment alleges that Defendant Natividad Aguilera Garcia ("Aguilera") produced visual depictions involving a minor engaged in sexually explicit conduct in violation of 18 U.S.C. §§ 2251(a); received visual depictions involving a minor engaged in sexually explicit conduct in violation of 18 U.S.C. § 2252(a)(2); engaged in online enticement of a minor in violation of 18 U.S.C. § 2544(b); transported a minor with intent to engage in sexual conduct in violation of 18 U.S.C. § 2423(a); encouraged and induced illegal entry in violation of 8 U.S.C. § 1324; and made false statements and presented false documents in violation of 18 U.S.C. § 1001(a)(2), (3).   [DE 1 (Indictment)].   The United States properly moved for Aguilera's detention under 18 U.S.C. § 3142(f)(1)(A), (B), and (E) during arraignment proceedings.   [DE 5].   At the beginning of the Detention Hearing, the United States moved for detention on the basis of 18 U.S.C. § 3142(f)(2)(A) and (B).   After considering the record—including

1

testimony, proffer, and arguments—the Court shall grant the United States' motion and detain Aguilera pending trial.

## I.   FACTUAL & PROCEDURAL BACKGROUND

Homeland Security Investigations ("HSI") Special Agent Justin Manning ("SA Manning") testified about the investigation into Aguilera that began in late 2021. According to SA Manning, Aguilera is a lawful permanent resident and a Honduran citizen residing in the United States.  SA Manning became aware of Aguilera after being contacted by the Department of Health and Human Services Office of Inspector General ("HHS OIG") regarding a missing unaccompanied minor previously in its custody.  The alert was preceded by a report filed by Lilia Angelica Aguilera ("Lilia"), Aguilera's wife, in September 2021.  SA Manning testified that, in her report, Lilia stated she became aware of a minor female ("Minor A") that was released to Aguilera's custody upon false pretenses that Aguilera was Minor A's relative.  Lilia also reported discovering sexually explicit images of Minor A on an electronic device used by Aguilera.  She told HHS that Aguilera had brought Minor A from Honduras to "be his woman."

During the investigation into Aguilera, SA Manning and other agents and police officers interviewed Minor A, witnesses, and Aguilera; they also reviewed document evidence, financial transactions, and cell phone extractions.  Based on the investigation, Aguilera met Minor A in Spring 2021.  Minor A told agents that her relationship with Aguilera developed while he was visiting Honduras from the United States.  During that time, they became interested in each other and started a relationship that eventually resulted in a sexual encounter.  Not only was she

underage at the time of the sexual encounter, but Minor A indicated that she felt "forced", "dirty", and "used" following the encounter.  Consequently, Minor A felt no man would ever want her, prompting her to accept Aguilera's offer to join him in the United States.

SA Manning also testified that Minor A sent Aguilera sexually explicit images of herself before coming to the United States, and while Aguilera was in Shelbyville, Kentucky.  Law enforcement located those images on Aguilera's device confirmed that she did send images in various states of undress, including complete nudity.  The images were sent via WhatsApp.  While Aguilera initially denied the existence of the photographs in an interview, he ultimately denied soliciting the photographs and claimed that he deleted them soon after receipt.  He told law enforcement that, in fact, he scolded Minor A for sending such photos because he knew mere possession of them was illegal.  SA Manning testified that this was wholly inconsistent with Minor A's account, where she claims that Aguilera requested the images because he wanted to "see all of her."

Aguilera likewise claims he was unaware that Minor A was coming to the United States until she was already on her way.  However, there is evidence of financial transactions corroborating Minor A's claim that Aguilera funded her journey to the United States with the express goal of continuing the romantic relationship that began in Honduras.  SA Manning testified that Aguilera not only encouraged Minor A to join him in the United States, but also provided financial support to do so by sending money to her during her trek from Honduras to the United

States.  The investigation also revealed that Minor A traveled with her friend, with Kellin Oviedo ("Oviedo"), and Oviedo's minor child.  According to SA Manning, an individual known as El Tigre provided Aguilera with additional funds to smuggle Oviedo and her child, with the ultimate goal of Oviedo coming to the United States to be in a relationship with El Tigre.

Minor A and Oviedo arrived in the United States in September 2021 and were apprehended by border patrol agents.  Following her arrival, Minor A was placed in an Office of Refugee Resettlement ("ORR") shelter in Texas because she was an unaccompanied minor.  Soon after that, Aguilera completed an application to sponsor Minor A through the ORR, which, if approved, would allow him to take custody of Minor A.  As part of that application, Aguilera claimed to be her uncle and supplied a false birth certificate with a fictitious name and parentage for Minor A to corroborate his false statements.

Minor A was ultimately released to Aguilera's custody in September 2021, while Oviedo remained in Texas.  He picked her up from the airport in Louisville, which was documented by security footage at the airport.[1]  When she arrived, he met Minor A at the gate, after which they left the airport and went to El Tigre's house. Minor A later told agents she had an additional sexual encounter with Aguilera while at El Tigre's house.  Corroborating the timing of their sexual encounter, SA Manning

---

[1] Two days after Minor A arrived in Louisville, SA, Manning testified that Minor A described Aguilera arranging a "fake" arrival for her true aunt and uncle to account for the time she had been with Aguilera.

testified that a forensic examination of Aguilera's cellular device showed that shortly after law enforcement first contacted Aguilera in early October 2021, Aguilera searched online for information on how long after intercourse sexual contact can be detected.

Law enforcement had several interactions with Aguilera, leading to charges in Shelby Circuit Court in March 2022. According to the Pretrial Services Report ("PSR"), Aguilera was released on a cash bond before his federal indictment and arrest. His release conditions included home incarceration with electronic monitoring and a prohibition on contact with minors, except his children, and victims. However, concerning issues arose regarding Aguilera's compliance with these conditions. SA Manning testified that Aguilera attempted to remove the electronic monitoring condition by asking his employer to write a letter to the court, claiming his job required overnight trips. The employer complied, and the court subsequently removed the electronic monitoring, although SA Manning revealed that Aguilera's job did not actually require such travel. Furthermore, in violation of his release conditions, Aguilera attended church with Minor A at least once after posting bond. This was particularly troubling as it breached the specific condition prohibiting contact with minors or his victims.

According to the PSR, and proffer by the United States, a bench warrant was issued for Aguilera on March 18, 2024, following three failures to appear for court associated with this state charges. Defense counsel proffered that these failures to

appear resulted from a gross misunderstanding of instructions by state court defense counsel caused by an English-Spanish language barrier.

## II.   **LEGAL FRAMEWORK**

Multiple charges in the Indictment involve at least one minor victim, meaning that a detention presumption arises under the Bail Reform Act, 18 U.S.C. § 3141, *et seq.*, ("BRA") both as to a risk of nonappearance and as to a risk of danger to the community.  18 U.S.C. § 3142(e)(3)(E).  Accordingly, a defendant carries a "burden of production" to overcome the presumption by offering "at least some evidence" that he is neither at risk of nonappearance nor endangering the community.  *United States v. Stone*, 608 F.3d 939, 945 (6th Cir. 2010).  The production burden "is not heavy," and the Government retains the ultimate burden of persuasion.  *Id.*  If the defendant fails to rebut the presumption, he must be detained.  Even if the defendant rebuts the presumption, the presumption remains a factor in determining detention.  *Id.* ("The presumption remains as a factor because it . . . reflects Congress's substantive judgment that particular classes of offenders should ordinarily be detained prior to trial.").

However, if a defendant rebuts the presumption of detention, the burden shifts back to the United States to persuade the Court that detention is nevertheless warranted.  Detention, based on danger, must rest on facts supported by clear and convincing evidence. 18 U.S.C. § 3142(f).  A flight-based (or, more accurately, nonappearance-based) detention decision must rest on facts supported by a preponderance of evidence.  *United States v. Patriarca*, 948 F.2d 789, 793 (1st Cir. 1991); *United States v. Curry*, No. 6:06-82-DCR, 2006 U.S. Dist. LEXIS 49661, 2006

WL 2037406, at *6 (E.D. Ky. Jul. 18, 2006).  Further, almost any conditional release ultimately depends on a court's assessment of a defendant's good faith intentions and predicted compliance with conditions imposed.  *See United States v. Tortora*, 922 F.2d 880, 887 (1st Cir. 1990) (evaluating predicted good faith compliance as critical release component).

Evidence rules do not apply in the detention hearing context. 18 U.S.C. § 3142(f).  The hearing is informal, and the Court may consider a wide range of proof, weighing the evidentiary reliability and accuracy.  *See, e.g.*, *United States v. Webb*, 149 F.3d 1185 (Table), No. 98-1291 [published in full-text format at 1998 U.S. App. LEXIS 13553], 1998 WL 381686, at *1 (6th Cir. June 22, 1998).  The nature and quality of proof impacts its probative value and weight in the detention calculus.  The § 3142(g) factors guide the analysis.

### III.   ANALYSIS

The Court conducted a detention hearing and afforded both sides all procedural rights outlined in the BRA. [DE 5].  Below, the Court shall consider all testimony, proffer, and arguments from the parties to assess whether Aguilera had overcome the presumption of detention and, if so, whether the United States met its burden of persuasion that the § 3142 factors demand detention.

### A.   RISK OF NONAPPEARANCE

Preliminarily, the Court finds that Aguilera overcame the presumption as to his risk of nonappearance.  Evidence presented includes Aguilera's nearly two-decade status as a lawful permanent resident, residing in Louisville and Shelbyville, Kentucky since his arrival in 2005.  He has substantial community ties through his

sister living in Shelbyville, his wife and three children in Louisville, and his involvement in the local Honduran community and church activities. Further, Aguilera proposed that he can continue to reside with his friend and pastor, Alberto Pinera, if released. Notably, his criminal history is limited to traffic tickets before the inception of the related state court action in March 2022. Despite the pending felony charge, he was previously released on cash bond and traveled to and from Honduras without issue, demonstrating a lack of nonappearance risk. Although he has lived at several addresses over the years, testimony and proffer indicate that law enforcement has consistently located Aguilera without difficulty, reinforcing his community ties and mitigating concerns about his potential flight.

With Aguilera having overcome the presumption of detention, the Court considers whether the United States has shown by preponderant evidence that he is a risk of nonappearance. The United States pursues two lines of argumentation. First, it argues that his history of failing to appear in state court, evidenced by three missed appearances and a subsequent bench warrant, indicates a risk of nonappearance. However, the Court recognizes potential communication issues due to a language barrier with his state court counsel and the prolonged nature of the case as contributing factors to his previous nonappearances. Moreover, despite his inconsistent residential addresses, law enforcement has effectively located Aguilera when needed. Second, the United States argues under § 3142(f)(2)(A) and (B) that Aguilera is a risk of flight and of obstructing justice, not mere nonappearance. The United States argues that Aguilera possesses significant international ties, has lied

8

to law enforcement, defrauded the government by making false statements and presenting false documents, and generally obstructed justice.   While foreign connections alone are not decisive in determining eligibility for pretrial release, they can influence the decision adversely under certain conditions. *United States v. Chen*, 820 F. Supp. 1205, 1208 (N.D. Cal. 1992) ("Alienage is a factor which may be taken into account, but by itself cannot be determinative."); *United States v. Sheikh*, 994 F. Supp. 2d 736, 741–42 (E.D.N.C. 2014) (finding that the defendant's family ties abroad, and prior international travel weighed against pretrial release).  In Aguilera's case, these international ties are compounded by evidence that he facilitated the illegal entry of two individuals into the United States by inducing their departure and providing financial support for their smuggling.  In addition to the evidence that he engaged in such conduct, the United States offered testimony and evidence that Aguilera lied to multiple government officials and presented forged documents to substantiate his lies.

Although Aguilera's ties to the community weigh in favor of release, the Court cannot ignore the concerning conduct surrounding his interaction with law enforcement and other government entities. SA Manning's testimony indicates that Aguilera has been uncooperative at several turns, has changed his story, and obstructed law enforcement when investigating Minor A's whereabouts.  This together, along with Aguilera's international ties, put the United States at the cusp of the preponderant evidence threshold.  However, the Court finds it could craft conditions that would mitigate Aguilera's risk of nonappearance, such as home

incarceration and electronic monitoring.  Thus, the Court declines to detain Aguilera due to a risk of nonappearance.

**B.    DANGER TO THE COMMUNITY**

Aguilera did not successfully rebut the presumption of detention regarding his risk of danger to the community.  Aguilera produced very little evidence that he is not a danger to the community other than simply pointing to his lack of serious criminal history.  Even if the Court generously construed to record to find that Aguilera did overcome the presumption, the Court would nonetheless find that the United States has proven by clear and convincing evidence that he poses a danger to the community under the BRA framework, as explained below.

**1.    Nature and Circumstances of the Offense**

The first factor asks the Court to weigh "the nature and circumstances of the offense charged, including whether the offense is a crime of violence . . .  or involves a minor. . . ."  18 U.S.C. § 3142(g)(1).  Irrefutably, Aguilera's alleged crimes—Counts 1, 2, and 4) involve a minor and are consequently crimes of violence.  18 U.S.C. § 3156 (defining "crime of violence" as used in the BRA to include "any felony under chapter . . . 117[.]").  *United States v. Champion*, 248 F.3d 502, 506 (6th Cir. 2001) (recognizing that violations of federal laws designed to protect minors constitute crimes of violence); *United States v. Campbell*, 256 F.3d 381, 397–8 (6th Cir. 2001); *see also United States v. Martinez*, 250 F.3d 1101, 1105 (7th Cir. 2001) (stating "[e]ngaging in sexual intercourse with a thirteen-year-old girl was a 'crime of violence'"); *United States v. Abad*, 350 F.3d 793, 798–99 (8th Cir. 2003) (recognizing that a crime involving a minor victim constitutes a crime of violence).

Aguilera faces seven charges, two of which (Counts 1 and 2) involve the production and receipt of visual depictions of a minor engaged in sexually explicit conduct, and one of which (Count 4) involves the transport of a minor with intent to engage in sexual conduct. Compounding these offenses, which specifically carry the presumption of detention, are the other four counts that illustrate the lengths to which Aguilera went to ensure Minor A's presence in the United States and his control over her upon her arrival. The United States, in particular, emphasized the coercive nature of Aguilera's first alleged sexual counter with Minor A in Honduras and that it led Minor A to believe she had no choice but to join Aguilera in the United States. The United States also emphasized Aguilera's efforts to take custody of Minor A by supplying government agencies with false statements and documents. Together, these circumstances add a layer of alleged criminality, resulting in this factor weighing heavily in favor of detention.

## 2.   Weight of the Evidence of Dangerousness

The second factor—the weight of the evidence of a person's dangerousness—goes only to the likelihood that the defendant will pose a danger to the community or a risk of flight; it is not a pretrial determination of guilt. *Stone*, 608 F.3d at 948. In weighing the strength of the evidence, the district court may not modify or limit the defendant's presumption of innocence. 18 U.S.C. § 3142(j).

Given the facts alleged—and their inherent dangerousness—the weight of the evidence of dangerousness is inextricably intertwined with the weight of the evidence as to the crime alleged. There is substantial evidence of Aguilera's prurient interest

11

in at least one minor, Minor A.  The United States offered ample testimony and presented evidence demonstrating that Aguilera allegedly preyed upon Minor A in Honduras in 2021 and ultimately coerced her into having sexual intercourse. Furthermore, the United States presented evidence and testimony that Aguilera induced Minor A to travel to the United States and paid for a coyote to facilitate her illegal entry.  Evidence and testimony show that Aguilera lied to a federal agency and that he pretended to be Minor A's uncle, all so he could take custody of her and ultimately engage in sexual intercourse with her again while she was still a minor. Evidence also shows, as the Indictment alleges, that he solicited nude photos of Minor A, and such photos were recovered from electronic devices used by him.  So, even if Aguilera and Minor A never had sexual intercourse, the Court can nonetheless find dangerousness based on his alleged solicitation and receipt of child sex abuse materials.  *See United States v. Fitzhugh*, No. 16-mj-30364, 2016 U.S. Dist. LEXIS 122953, 2016 WL 4727480, at *5 (E.D. Mich. Sept. 12, 2016) (denying revocation of detention order because "*[j]ust one* sexually-related offense against just one minor is enough to imply dangerousness").  Given the weight of the evidence and proffer of Aguilera's alleged conduct, this factor likewise weighs heavily in favor of detention.

### 3.    History and Characteristics of the Person

The history and characteristics of a defendant include "the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court

proceedings." 18 U.S.C. § 3142(g)(3)(A). Additionally, they include whether the defendant was on probation or parole when he committed the offense. 18 U.S.C. § 3142(g)(3)(B).

Undoubtedly, most of these considerations weigh in Aguilera's favor, as the United States provided no evidence suggesting that Aguilera has a criminal history or any other history that would favor detention. In the nearly twenty years that Aguilera has lived in the United States, he has incurred little more than a traffic ticket until his indictment in Shelby Circuit Court in 2022. Overall, this factor weighs in favor of release.

### 4. __Nature and Seriousness of the Danger__

The fourth and final factor is "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g)(4). Here, forensic examinations found nude photographs with exposed genitalia on Aguilera's electronic device. The photographs alone could cause real, lasting harm to Minor A. *See Pece*, 2020 U.S. Dist. LEXIS 197356, 2020 WL 6263640, at *6–7 (recognizing the danger of such images because they "permanently records the victim's abuse, and [their] continued existence causes the child victims of sexual abuse continuing harm by haunting those children in future years"). Indeed, "[r]eceipt . . . and possession of child pornography are extremely dangerous to the community, particularly because such activities are often hidden from a defendant's closest friends and family members." *United States v. Tang*, No. 19-cr-00014, 2019 U.S. Dist. LEXIS 98602, 2019 WL 2453655, at *4 (E.D. Ky. June 12, 2019).

13

Additionally, there is evidence that Aguilera's alleged abuse escalated to physical abuse when he engaged in sexual intercourse with Minor A at least twice.

On balance, the alleged offenses are compounding in their seriousness. Aguilera allegedly made false statements, presented false documents, and induced Minor A's illegal entry with the express goal of continuing the sexual relationship that began in Honduras in 2021. The lengths to which Aguilera went to have Minor A transported to Kentucky so he could carry on the relationship are of grave concern not only when considering Minor A's but the safety of other potential victims in the community.

For the reasons above, the BRA factors favor finding that Aguilera poses a significant danger to the community and unquestionably favor danger-based detention. The only remaining question is whether the Court can impose release conditions or a combination of release conditions that could sufficiently mitigate Aguilera's danger to the community. On this point, the Court is concerned that, according to SA Manning's testimony, Aguilera attended church with Minor A after his release and violated his state bond conditions.

As demonstrated by Aguilera's flagrant disregard for his state bond conditions by attending church with his victim, home detention and electronic monitoring do not suffice to mitigate his potential danger to the community. The Court could limit his cell phone or internet usage, but courts in the Sixth Circuit have repeatedly noted that prohibiting a defendant's access to the internet while on pretrial release is impractical—if not impossible. *United States v. Hoilman*, No. 22-6108, 2023 U.S.

14

App. LEXIS 9947, WL 4074630 at *6 (6th Cir. Apr. 24, 2023) ("The ubiquity of the internet makes it exceedingly difficult to completely prevent someone from accessing it[.]").  *See United States v. Downsbrough*, No. 3:13-CR-61, 2013 U.S. Dist. LEXIS 208955, WL 2447858 at *7 (E.D. Tenn. June 3, 2013) (stating that imposing a third-party custodian, electronic monitoring, and a one-million-dollar bond could not reasonably assure the safety of the community); *United States v. Sammons*, No. 2:19-cr-107, 2020 U.S. Dist. LEXIS 22467, WL 613930 at *18–19 (S.D. Ohio Feb. 10, 2020) (stating "there would be no real mechanism to enforce or police" defendant's promises that he would abstain from using the internet); *United States v. King*, No. 3:22-CR-60-TAV-DCP-1, 2022 U.S. Dist. LEXIS 152150, WL 3645996 at *9 (E.D. Tenn. Aug. 24, 2022) (rejecting defendant's proposition that his wife could reasonably monitor him to ensure he would not access the internet while on release).  In sum, the Court cannot craft conditions that would sufficiently mitigate Aguilera's dangerousness—particularly the danger he poses to Minor A or other minors in the community.

## IV.   <u>CONCLUSION</u>

For the above-stated reasons, the Court finds that it could craft conditions to mitigate Aguilera's risk of flight.  However, the United States proved by clear and convincing evidence that Aguilera is an irremediable danger to the community.  As such, the Bail Reform Act mandates detention.  The Court has assessed the record, contemplated the risks, evaluated conditions, and determined that no conditions exist that can reasonably assure Aguilera will not pose a danger to another or the community.  Accordingly, the Court **GRANTS** the United States' oral motion for detention and **DETAINS** Defendant Natividad Aguilera Garcia.

The parties may appeal this Order under the terms of 18 U.S.C. § 3145(a).

Entered this 24th of April, 2024.

MATTHEW A. STINNETT
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF KENTUCKY

**16**